IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LLOYD L. LOFTON III, JOSHUA DILLON BATES, and DANIEL R. WAGNER,<br><br>    Plaintiffs,<br><br>v.<br><br>STATE OF IOWA, KENNETH KERR, COURTNEY M. KAY-DECKER, and BETTY MATHIS,<br><br>    Defendants. | **No. 4:17-cv-00301-RGE-CFB**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Plaintiffs Lloyd L. Lofton III, Joshua Dillon Bates, and Daniel R. Wagner are employees of the Iowa Department of Revenue ("IDR"). They bring this lawsuit against the State of Iowa, former IDR director Courtney M. Kay-Decker, IDR supervisor Betty Mathis,[1] and former IDR employee Kenneth Kerr. Plaintiffs allege Kerr stalked, harassed, and secretly photographed and videotaped them at work, often while they were using the restroom. Plaintiffs allege the IDR and its supervisors knowingly tolerated Kerr's misconduct for years. Their complaint asserts both state law intentional and negligence-based tort claims and a claim under 42 U.S.C. § 1983 for damages related to Kerr's harassment.

Defendants State of Iowa, Kay-Decker, and Mathis move for summary judgment on some of Plaintiffs' claims against them.[2] For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment.

---

[1] Plaintiffs have voluntarily dismissed Defendant Paul Benson. Pls.' Stipulation Dismissal Def. Paul Benson, ECF No. 62. As such, the Court does not address Defendant Benson's motion for summary judgment.

[2] Kerr does not join Defendants' motion for summary judgment. For simplicity, the Court generally refers to the Defendants joining this motion as "Defendants," and refers to Kerr by name.

## II.    BACKGROUND

The following facts are either uncontested or, if contested, viewed in the light most favorable to Plaintiffs. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *see also* Pls.' Resp. Defs.' Statement Material Facts Supp. Defs.' Mot. Partial Summ. J., ECF No. 58-5; Defs.' Resp. Pls.' Statement Add'l Material Facts Supp. Pls.' Resist. Defs.' Mot. Partial Summ. J., ECF No. 64; Defs.' Reply Pls.' Resp. Defs.' Statement Material Facts Supp. Defs.' Mot. Partial Summ. J., ECF No. 65; Defs.' Sealed Resp. Pls.' Statement Add'l Material Facts Supp. Pls.' Resist. Defs.' Mot. Partial Summ. J., ECF No. 66.

### A.    Factual Background

Plaintiffs Lloyd Lofton, Josh Bates, and Daniel Wagner work at the IDR. ECF No. 58-5 ¶¶ 6–8. Wagner began working at the IDR in March 1997 and now serves as an Executive Officer 2. *Id.* ¶ 6. Bates began working at the IDR in August 2013 and now serves as a Revenue Auditor 2. *Id.* ¶ 8. Lofton began working at the IDR in January 2015 and now serves as a Revenue Examiner 2. *Id.* ¶ 7.

The IDR is a division of the State of Iowa, established under Iowa Code § 421.2. *Id.* ¶ 1. Defendant Courtney M. Kay-Decker was the Director of the IDR from January 14, 2011 until January 2, 2019. *Id.* ¶ 2. Defendant Betty Mathis began working at the IDR in 1977. *Id.* ¶ 4. At the time of her retirement on April 29, 2016, Mathis was a Public Service Manager 1. *Id.* In that role, Mathis had supervisory authority over employees. ECF No. 64 ¶ 2. Supervisor Paul Benson began working at the IDR in 1984 and retired in December 2014. ECF No. 58-5 ¶ 3. At the time of his retirement, Benson was a Public Service Executive 3. *Id.* Benson had supervisory authority over employees. ECF No. 64 ¶ 3.

Kenneth Kerr began working at the IDR in 1996 as a Revenue Examiner I. ECF No. 58-5 ¶¶ 5, 19. He was terminated on August 21, 2015. *Id.* ¶ 54. For the bulk of

Kerr's employment, he was a Management Analyst 2. *Id.* ¶ 20. In that role, Kerr reimbursed tax monies to local governments. *Id.* ¶ 21. His core job functions included administering tax laws and collecting and distributing revenue according to Iowa's tax laws. *Id.*

### 1.    Kerr's misconduct toward Plaintiffs

Throughout his employment at the IDR, Kerr engaged in sexually motivated misconduct toward other male employees. *See id.* ¶¶ 13–29, 34–37. Kerr's misconduct included photographing male employees using the urinal, photographing and videotaping male employees using the toilet, and photographing their clothed crotches and backsides. *See id.*; ECF No. 66 ¶ 1. These behaviors started as early as 1999 and eventually led to Kerr's termination in August 2015. ECF No. 58-5 ¶ 13. Kerr was then criminally convicted for stalking and invasion of privacy. ECF No. 64 ¶ 103.

Plaintiff Wagner was the victim of much of Kerr's misconduct. Kerr and Wagner worked on the same floor of the IDR from 1997 to 2015. *See* ECF No. 58-5 ¶¶ 9–12. Starting around 1999, Wagner began noticing that Kerr was often in the restroom when he was. *Id.* ¶ 13. Kerr would use an immediately adjacent urinal and attempt to have conversations with Wagner. *Id.*; ECF No. 64 ¶¶ 73–74. At some point, Wagner also began noticing that Kerr took pictures of him, watched him walk into the IDR building, and always knew where he was. ECF No. 64 ¶ 74. Kerr testified in his deposition that he went out of his way to interact with Wagner: He checked Wagner's calendar at least once a day. *Id.* ¶ 35. He planned interactions with Wagner ahead of time, such as purposely running into him at work meetings or asking Wagner to go to lunch or play golf with him. *Id.* ¶ 33. And he left candy and gifts on Wagner's desk. *Id.* ¶ 36.

Kerr followed Wagner both at work and outside of work. At work, he often walked past conference rooms where Wagner was in meetings. ECF No. 64 ¶ 48. He also followed Wagner into the restroom, with the intent to view, and sometimes to photograph or take videos of, Wagner's

genitals. ECF No. 58-5 ¶ 28. Kerr could photograph and take videos of Wagner in the IDR restroom by sitting in the stall next to Wagner and filming under the wall of the adjoining stall. *Id.* ¶ 29. Outside of work, Kerr followed Wagner to places like the golf course, Wagner's children's baseball games, and Wagner's house. *Id.* ¶ 26.

In 2006, Travis Brown began working at the IDR. ECF No. 64 ¶ 75. Brown and Wagner became friends. *Id.* Wagner spoke to Brown about Kerr's behavior, wanting to make sure it was not just a coincidence that Kerr was always in the restroom when Wagner was. *Id.* Brown confirmed Kerr was following and watching Wagner. *Id.* ¶ 76. Brown and Wagner subsequently noticed that Kerr was photographing them under the table during work and at lunch. *Id.* ¶ 77. Wagner also discussed Kerr's behavior with other IDR employees. For example, Wagner told co-workers that Kerr had videotaped his backside when he was putting at the golf course. *Id.* ¶ 79. He also discussed with them how Kerr had showed up uninvited at the golf course and watched Wagner golf from the parking lot. *Id.*

In late 2011, Kerr started keeping a journal where he catalogued his attempts at video recording and photographing male employees, including Wagner. *Id.* ¶¶ 54–55. He started journaling by sending himself emails about his daily encounters with Wagner. *Id.* ¶ 55. He eventually compiled a lengthy document cataloguing his behavior toward Wagner and other male employees. ECF No. 66 ¶¶ 6–11; Pls.' Sealed App. Supp. Pls.' Resist. Defs.' Mot. Partial Summ. J. at Pls.' App. 56–300, ECF No. 59-1. In July 2013, another IDR employee found a page of Kerr's journal on an IDR printer and told Wagner about it. ECF No. 58-5 ¶ 31. Wagner testified in his deposition he did not see the page and was not aware it was part of a larger document, though he did recall certain details about its content. *Id.*; ECF No. 65 ¶ 31. Based on this testimony, the parties dispute whether Wagner understood at the time that the page was part of a journal.

ECF No. 58-5 ¶ 31; ECF No. 65 ¶ 31. Wagner testified he is pretty sure he notified a supervisor about the page found on the printer. ECF No. 58-5 ¶ 32; ECF No. 65 ¶ 32.

Kerr engaged in some of the same behaviors toward Plaintiffs Bates and Lofton when they began working at the IDR. Bates started working at the IDR on the same floor as Kerr in August 2013. *See* ECF No. 58-5 ¶¶ 11, 35. Bates was transferred to a different location in January 2015 for reasons unrelated to this lawsuit. *Id.* ¶ 11. Soon after Bates began working at the IDR, Kerr started following him into the restroom with the intended purpose of viewing, and sometimes photographing or videotaping, Bates's genitals. *Id.* ¶ 36. Kerr testified in his deposition he followed Bates into the restroom once or twice a day, though not necessarily every day. ECF No. 64 ¶ 49. Kerr estimates he took between 30 and 50 photos, both successfully and unsuccessfully, of Bates's unclothed genitals, half of dozen videos, both successfully and unsuccessfully, of Bates's unclothed genitals, and between ten and twenty photos of Bates's clothed crotch area. *Id.* ¶ 50. Bates was not aware that Kerr was engaging in this behavior toward him, or toward any other male employee, until August 2015—months after Bates was transferred to a different location. ECF No. 58-5 ¶¶ 48–49; ECF No. 65 ¶ 43.

Plaintiff Lofton began working for the IDR in January 2015. ECF No. 58-5 ¶ 7. Shortly after Lofton started working at the IDR, Kerr began following him into the restroom with the intended purpose of viewing, and sometimes photographing or taking videos of, his genitals. *Id.* ¶ 37. Kerr estimates he followed Lofton into the restroom once or twice per week for the last four to six months of Kerr's employment. ECF No. 64 ¶ 51. Kerr estimates he took between 10 and 20 photographs of Lofton's unclothed genitals. *Id.* As discussed below, Lofton eventually caught Kerr filming him in the restroom in August 2015. ECF No. 58-5 ¶ 46. Lofton had previously noticed Kerr behaving strangely toward him. *See id.* ¶ 44. He had also noticed that Kerr was secretly photographing employees in the breakroom. *See id.* ¶ 45. But Lofton testified he did

not notice Kerr's strange behavior toward him until he learned of Kerr's behavior toward Wagner, and he is unsure if he would have noticed Kerr photographing employees in the break room if he had not first learned that Kerr had photographed Wagner and Brown under the table at lunch. ECF No. 64 ¶ 90; ECF No. 65 ¶¶ 44–45. When Lofton eventually caught Kerr filming him, he was specifically looking for such behavior. ECF No. 58-5 ¶ 46. Lofton reported this behavior. *Id.* ¶ 47.

For the first half or two-thirds of his employment at the IDR, Kerr spent no more than half an hour of work time on these illicit activities. *Id.* ¶ 22; ECF No. 65 ¶ 22. But in later years, Kerr became more brazen. He spent an hour or two per day, and up to four hours on some occasions, following male employees around and into the restroom, photographing them, and journaling. ECF No. 58-5 ¶¶ 23, 25; ECF No. 64 ¶ 58; Kerr Dep. 29:22–30:22, 85:22–86:20, Defs.' App. Supp. Defs.' Mot. Partial Summ. J. at STATE APP. 0045, 0053, ECF No. 47-3. From 2013 to 2015, Kerr sometimes spent 60 to 90 minutes of work time following or monitoring Wagner specifically. ECF No. 64 ¶ 47. Kerr would also take long lunches some days and go to an adult bookstore to watch pornography. Kerr Dep. 30:22–33:1, ECF No. 47-3 at STATE APP. 0045. When Kerr went to the bookstore during work hours, he exceeded his allotted break time. ECF No. 64 ¶ 44. Between 2013 and 2015, Kerr went to the bookstore two or three times per week during work hours. *Id.* ¶ 45. Kerr does not recall a supervisor questioning him about exceeding his break time. *Id.* ¶ 44.

Kerr testified that his photographs, videos, and journaling were an extension of his pornography addiction, and that he derived excitement and stimulation from these activities. ECF No. 58-5 ¶ 42; Kerr Dep. 83:4–84:24, ECF No. 47-3 at STATE APP. 0052.

Kerr took certain measures to conceal his behavior. He kept his journal password-protected on his computer so no one else could access it. *Id.* ¶ 38; Kerr Dep. 77:10–13, ECF No. 47-3 at STATE APP. 0051. He used external storage devices and email to move electronic files in a way

that would evade detection. ECF No. 58-5 ¶ 39. And he tried to hide that he was filming and photographing his co-workers in the restroom. *Id.* ¶ 40.

When asked at his deposition if he knew his behaviors were impermissible at the IDR, Kerr answered, "I didn't know that. I should have known that. Did I know that? It's a hard one to answer. I don't know if it's ever explicitly listed in a document, but yes, it would probably not be permissible." Kerr Dep. Vol. II 133:16–134:1, ECF No. 47-3 at STATE APP. 0058. He further testified he was never under the impression that the IDR would find his behavior acceptable, and that no one at the IDR had ever told him it was. Kerr Dep. Vol. II 134:18–135:2, ECF No. 47-3 at STATE APP. 0058.

### 2.   IDR's knowledge of Kerr's misconduct

Defendant Mathis supervised Wagner and Kerr from their respective start dates until 2013. ECF No. 58-5 ¶ 9. Wagner did not report Kerr's behavior to Mathis—or to any other supervisor—until after 2006. *Id.* ¶ 14. Sometime after 2006—and after Brown confirmed Wagner's suspicions about Kerr—Wagner reported to Mathis that Kerr was following him into the restroom and that he believed Kerr was looking at his genitals at the urinal and was also filming him when they went to lunch. *Id.* ¶ 16. Mathis asked Wagner what action he wanted her to take. *Id.* ¶ 17. Wagner told her he would "deal with it," and let her know if the situation became worse. *Id.* Wagner felt that, because he had no proof, Mathis could only give Kerr a slap on the hand. *Id.* ¶ 18. Mathis did not pressure Wagner not to pursue a complaint about Kerr. *Id.* Wagner never reported his suspicions about Kerr filming him in the restroom because he felt he lacked proof. ECF No. 64 ¶ 85; ECF No. 65 ¶ 18. The IDR's Chief Operating Officer, Jessica Holmes, testified in her deposition that Wagner was not required under the IDR's sexual harassment policy to ask Mathis to act on his complaint. ECF No. 64 ¶ 24. She further testified a sexual harassment

7

complaint can be general, and that she would consider a complaint that an employee was being followed around by another employee to be a sexual harassment complaint. *Id.*

On another occasion, Wagner asked Mathis to watch and see if Kerr was waiting for him to leave work. ECF No. 64 ¶ 166. Wagner pointed out to Mathis that Kerr was sitting and waiting in his car after work. *Id.* ¶ 168. Mathis asked if that was a problem, and Wager said, "Well, I'm not sure why—you know, why he's waiting for me to come out." *Id.* ¶ 169. Holmes testified that Mathis should have, but did not, report this incident to HR at the time. *Id.* ¶ 166.

In his deposition, Wagner testified that Mathis personally observed Kerr filming him under the table at a holiday lunch in December 2012 or January 2013 and that she pulled Wagner aside and told him about it. ECF No. 64 ¶¶ 81, 164. Wagner testified he was "excited that they finally caught him," and believed there would be repercussions. *Id.* ¶ 81. Mathis denies she saw Kerr take a picture. *Id.* ¶ 165. Instead, she claims she saw Kerr holding his phone under the table with the screen light on, but she could not tell what he was doing with it. *Id.* She further testified Wagner "didn't seem overly upset" when she told him what she had seen. *Id.* ¶ 81. Mathis was eventually disciplined for failing to report this incident. *Id.* ¶ 174. Holmes testified the IDR's Human Resources Department probably would have checked Kerr's computer if Mathis had reported the incident. *Id.* ¶ 175.

Mathis did not discipline Kerr after the holiday lunch, so Wagner and Brown confronted him. *Id.* ¶ 82. Kerr's behavior did not change after they confronted him. *Id.* ¶ 83. From Wagner's perspective, it only got worse. *Id.* Wagner testified he started telling others about Kerr's behavior when he found out Mathis would not discipline him after what she witnessed at the holiday lunch. *Id.* ¶ 84. He told others the IDR was tolerating Kerr's behavior. *Id.*

Mathis testified in her deposition she heard rumors about Kerr's conduct, including that he was photographing male employees in the restroom, one to three weeks before Lofton's complaint

8

and the IDR's investigation into Kerr's conduct. *Id.* ¶ 173. But Mathis also testified she may have been mistaken, and that employees may have only been discussing that Kerr stalked other employees. *Id.*; Mathis Dep. 240:4–244:20, Defs.' Sealed Suppl. App. Supp. Defs.' Mot. Partial Summ. J. at APP. 047–048, ECF No. 67.

When Mathis stopped supervising Wagner and Kerr in 2013, Benson became Wagner's supervisor and Julie Roisen became Kerr's supervisor. ECF No. 58-5 ¶¶ 11–12. As early as the fall of 2012, Benson started referring to Kerr as "Dan's stalker." ECF No. 64 ¶ 138. Benson testified he did not use this term until he first heard Wagner use it. *Id.* Benson testified a few other employees also used this phrase. *Id.* ¶ 139. Wagner frequently discussed Kerr's behavior with Benson prior to Kerr's termination. *Id.* ¶¶ 143, 145. Benson testified Kerr stalked Wagner by hanging around and purposely showing up at the same places as Wagner. *Id.* ¶ 140. Benson also learned from Wagner that Kerr left cartoons, jokes, and chocolates on his desk. *Id.* ¶ 141. Wagner told Benson that Kerr was often in the restroom when he was and tried to photograph him under the lunch table. *Id.* ¶¶ 144, 146. Benson heard from others that Kerr was following Wagner and taking photographs of him outside of work. *Id.* ¶¶ 147, 151. At some point, Benson started alerting Wagner if Kerr was watching him enter the IDR building. *Id.* ¶ 142. Benson knew there were "some issues with [Kerr] getting stuff done on time." *Id.* ¶ 149. Benson remembers learning that Wagner confronted Kerr about his behavior. *Id.* ¶ 150.

Benson believes he discussed Kerr's behavior toward Wagner at a supervisor meeting prior to Kerr's termination. *Id.* ¶ 160. He also believes he discussed Kerr's behavior with supervisors Sam Hoerr, Marsha Peterson, and Scott Lockwood prior to Kerr's termination. *Id.* ¶¶ 118, 121, 154, 176. Benson considered Kerr's behavior, as Wagner described it to him, harassment. *Id.* ¶ 157. But Benson did not formally report Kerr's behavior or fill out a harassment complaint

for Wagner. *Id.* ¶ 154. Benson sometimes joked or laughed about Kerr's behavior toward Wagner. ECF No. 58-5 ¶ 62; ECF No 64 ¶ 161.

Hoerr became Wagner's supervisor after Benson's retirement in December 2014. ECF No. 58-5 ¶¶ 3, 12. Prior to Kerr's termination, Wagner told Hoerr that Kerr had feelings for him and that he was having trouble getting his work done because of Kerr's behavior. ECF No. 64 ¶¶ 113, 116–117. Wagner also asked Hoerr to read a message he was planning to send Kerr to communicate that he just wanted to be friends. *Id.* ¶¶ 114–15.

Roisen, who took over as Kerr's supervisor in 2013, testified Kerr was "slow about getting things done," but that he completed his work on time. ECF No. 58-5 ¶ 24; ECF No. 65 ¶ 24. Roisen did not investigate why Kerr was slow getting his work done. ECF No. 64 ¶ 180. Kerr's slow work pace led to him not receiving an "exceeds expectations" rating on his 2013–14 performance evaluation. *Id.* ¶ 181. Roisen also noticed that Kerr appeared to be gone from his desk more than other employees. *Id.* ¶ 182.

At some point, Peterson also acted as Kerr's supervisor. *Id.* ¶ 177. Peterson heard from Benson that Kerr had a reputation for wandering around and gossiping, and Peterson told Kerr that such behavior was unacceptable. *Id.* When Peterson was no longer Kerr's supervisor, she noticed Kerr wandering around. *Id.* ¶ 178. Peterson heard from others that Kerr was "strange" or unusual." *Id.* ¶ 179. Lofton claims he told Peterson that Kerr made him uncomfortable. *Id.*

Lockwood was an IDR supervisor who appears to have supervised Lofton. *See* ECF No. 64 ¶¶ 4, 137. Prior to Kerr's termination, Lofton told Lockwood that Kerr was going out of his way to talk to him. *Id.* ¶ 122. Also prior to Kerr's termination, Wagner showed Lockwood a message he sent Kerr telling Kerr, "you're crossing a line here." *Id.* ¶¶ 123–24. Wagner told Lockwood that Kerr seemed to know his schedule and watched him walk to the parking lot. *Id.* ¶¶ 125–26. On two occasions, Lockwood observed Kerr watching Wagner outside

10

of the IDR. *Id.* ¶ 127. Lockwood also observed Kerr wandering around at work. *Id.* ¶ 133. Wagner told Lockwood that Kerr followed him outside of work. *Id.* ¶¶ 128–30. Lockwood heard other IDR employees jokingly refer to Wagner as Kerr's crush, and admits he too may have made this comment. *Id.* ¶ 134. Lockwood characterized Kerr's conduct as "extreme" and testified in his deposition Kerr appeared to be obsessed with Wagner. *Id.* ¶¶ 135–36. Lofton claims that when he told Lockwood in August 2015 that Kerr had filmed him in the restroom, Lockwood laughed and said he was not surprised and that it was bound to happen to somebody. *Id.* ¶ 137. Lockwood disputes this account. *Id.*

Defendant Kay-Decker had no independent knowledge of Kerr or his improper behavior before the IDR's August 2015 internal investigation, in which she was not directly involved. ECF No. 58-5 ¶ 71.

Kerr's behavior toward Plaintiffs and other male employees was also known to some extent among non-supervisory employees. Holmes's administrative assistant, Megan Richmond, testified that Kerr's "fascination with men" was well known and she estimated that half the employees at the IDR considered Kerr "perverted and creepy." ECF No. 64 ¶¶ 104, 184. Benson testified Kerr's behavior toward Wagner was not common knowledge, but that a lot of people knew about it. *Id.* ¶ 107. Richmond testified that people noticed Kerr wandering around Wagner's area, and that Kerr did nothing to hide it. *Id.* ¶ 105; Richmond Dep. 22:16–20, ECF No. 59-1 at Pls.' Sealed App. 471.

Some IDR employees joked about Kerr's behavior toward Wagner. ECF No. 58-5 ¶ 62. Lofton was also subjected to jokes and mockery from other IDR employees about Kerr's behavior toward him. *Id.* ¶ 64. Lofton was friends with some of the employees who made these jokes. *Id.* ¶ 65. For example, some employees pretended to take photographs of Wagner and Lofton, mimicking Kerr's behavior toward them. ECF No. 64 ¶¶ 192, 196. Bates had no firsthand

knowledge of anyone mocking or scrutinizing him, though he was told by Lofton that it had occurred. ECF No. 58-5 ¶ 53.

Beyond his lower performance evaluation and his eventual termination, Kerr does not recall being disciplined at the IDR. ECF No. 64 ¶ 30. Defendants admit no supervisor ever counseled or disciplined Kerr regarding his behavior toward Plaintiffs. *Id.* ¶ 31. Kerr testified the lack of oversight at the IDR contributed to his actions. *Id.* ¶ 203. Holmes testified Roisen's lack of oversight contributed to Kerr's behavior. *Id.* ¶ 205. Holmes testified that more oversight from Roisen could have prompted an investigation sooner, and potentially prevented Lofton from becoming a victim. *Id.* ¶ 206. Defendants admit IDR supervisors can monitor employee emails by making a request to Human Resources. *Id.* ¶¶ 8–9. Plaintiffs offer the opinion of an expert who concludes:

> the IDR's failure to follow and implement its stated policies and procedures for harassment prevention and intervention, despite widespread awareness of this situation over an extended period of time reflects a lack of awareness of the nature and consequences of sexual harassment; this lack of awareness is attributable, among other things, to the department's failure to provide even rudimentary awareness training to its employees, as well as its failure to publicize and emphasize the stated policies and procedures adopted to provide a healthy workplace.

ECF No. 66 ¶ 22.

### 3. Investigation into Kerr's misconduct

In August 2015, Lofton caught Kerr filming him underneath a stall in the IDR restroom. ECF No. 58-5 ¶ 46; ECF No. 64 ¶ 86. Lofton reported Kerr's behavior to his supervisor, Lockwood, and to various other individuals. ECF No. 58-5 ¶ 47. He also told three IDR employees about the incident. ECF No. 58-5 ¶ 61.

Holmes investigated Lofton's report. *Id.* ¶ 50. Kerr kept working at the IDR pending this investigation. ECF No. 64 ¶¶ 94–95. Kerr's supervisor was instructed to keep a close eye

on him, but no other preventative steps were taken during the investigation. *Id.* ¶ 95. The IDR Human Resources Department searched Kerr's computer as part of the investigation. *Id.* ¶ 91. Kerr's journal was found on his computer, along with an Excel spreadsheet rating the genitals of various male employees, including Wagner. *Id.* ¶ 92. Kerr's journal was almost 250 pages long and contained entries about Wagner, Lofton, and Bates. ECF No. 66 ¶¶ 6–11; ECF No. 59-1 at Pls.' Sealed App. 56–300. This investigation led to Kerr's termination on August 21, 2015. ECF No. 64 ¶ 98. Kerr was terminated for violating the IDR's sexual harassment policy and certain work rules. *Id.* ¶ 99. One of these rule violations was for using the IDR's "ARTS" system for non-business purposes. *Id.* ¶ 100. The ARTS system is used to locate names and addresses. *Id.* ¶ 102. Holmes determined Kerr used the ARTS system to look up the addresses of his victims. *Id.*

The Iowa Division of Criminal Investigation also conducted a criminal investigation into Kerr's behavior. ECF No. 58-5 ¶ 51. Kerr eventually pled guilty to one count of stalking and two counts of invasion of privacy. ECF No. 64 ¶ 103.

During and after the IDR's investigation, Richmond—who had access to the information on Kerr's computer through her job as Holmes's administrative assistant—shared the existence of Kerr's journal with some other IDR employees. *Id.* ¶¶ 184–85, 187–89. The parties dispute whether Richmond also disclosed details about the journal or shared the existence of Kerr's rating system. *See id.* ¶¶ 187–89. Richmond testified that other information was disclosed to employees after the investigation. *Id.* ¶ 190. This information included that there were folders on Kerr's computer dedicated to different people, that Kerr's behavior toward Wagner was more extensive than was previously known, and that there were photos and videos of male employees on Kerr's computer. *Id.* Richmond was ultimately terminated, in part for sharing confidential information relating to the investigation. *Id.* ¶ 186.

13

### 4. Condition of IDR restrooms

After the State of Iowa replaced old toilet paper dispensers in the IDR's building, the walls of the stalls in the men's restroom on Plaintiffs' floor contained dime-sized holes. ECF No. 58-5 ¶ 66. Lofton complained about these holes and they were filled the next week, though Lofton testified holes remain in restrooms on other floors of the IDR. ECF No. 64 ¶ 210. Lofton testified the holes allow people in restroom stalls to see others standing up in adjacent stalls. *Id.* ¶ 208. Lofton testified he saw toilet paper stuffed in these holes at least once a week but removed later in the week. *Id.* ¶ 209.

Lofton also complained that a female janitor sometimes walked into the men's restroom unannounced to clean it. ECF No. 58-5 ¶¶ 68–69. The female janitor no longer works in the IDR's building. *Id.* ¶ 69.

Additional facts are set forth below as needed.

### B. Procedural Background

Plaintiffs filed a seven-Count complaint against Defendants State of Iowa, Kerr, Kay-Decker, and Mathis in the Iowa District Court for Polk County. Pet. 3–20, ECF No. 1-1. Plaintiffs alleged claims of intentional infliction of emotional distress against all Defendants (Count I); negligent infliction of emotional distress against Defendants State of Iowa, Kay-Decker, and Mathis (Count II); invasion of privacy against all Defendants (Count III); negligent retention and/or supervision against Defendants State of Iowa, Kay-Decker, and Mathis (Count IV); negligent training, retention, and/or supervision against Defendants State of Iowa and Kay-Decker (Count V); a claim under 42 U.S.C. § 1983 for violation of the constitutional right to privacy against all Defendants (Count VI); and a claim for negligence against Defendant Kerr (Count VII). *Id.* ¶¶ 40–100.

Defendants removed the action to this Court. Notice Removal, ECF No. 1. Defendants State of Iowa, Kay-Decker, and Mathis then moved to dismiss the complaint for failure to state a claim. State Defs.' Mot. Dismiss, ECF No. 7. The Court granted in part and denied in part Defendants' motion to dismiss. Order Re: State Defs.' Mot. Dismiss, ECF No. 17. Specifically, the Court granted Defendants' motion to dismiss the State of Iowa as a defendant on Plaintiffs' § 1983 claim and held Plaintiffs' § 1983 claim could proceed against Defendants Kay-Decker and Mathis only in their individual capacities. *Id.* at 16. The Court denied the motion to dismiss in all other respects. *Id.* at 4–13. Plaintiffs then filed an amended complaint, reasserting all claims that survived the motion to dismiss and adding Benson as a defendant on Counts I through IV and VI. ECF No. 30.[3]

Defendants now move for partial summary judgment on Plaintiffs' amended complaint. Defs.' Mot. Partial Summ. J., ECF No. 47. They ask the Court to dismiss all tort claims brought against Defendants Kay-Decker and Mathis in their individual capacities, arguing Kay-Decker and Mathis acted within the scope of their employment at all relevant times. Defs.' Br. Supp. Mot. Summ. J. 6–10, ECF No. 47-1. Defendants further contend the Court should hold Kerr acted outside the scope of his employment at all relevant times, such that the State of Iowa is not liable for his actions. *Id.* at 10–16. Finally, Defendants argue Plaintiffs' claims for intentional infliction of emotional distress (Count I), negligent infliction of emotional distress (Count II), invasion of privacy (Count III), and for constitutional violations under § 1983 (Count VI) fail on the merits. *Id.* at 16–28. Beyond their scope of liability arguments, Defendants do not move for summary judgment on Plaintiffs' claims for negligent retention and/or supervision (Count IV) and negligent

---

[3] As stated above, Plaintiffs subsequently voluntarily dismissed Defendant Benson. ECF No. 62.

training, retention and/or supervision (Count V). Kerr has not moved for summary judgment on any of the claims brought against him.

Plaintiffs resist Defendants' motion for partial summary judgment. Pls.' Br. Resist. Defs.' Mot. Partial Summ. J., ECF No. 61. Neither party requested oral argument and the Court declined to order it, finding the parties' briefing adequately presents the issues. *See* Fed. R. Civ. P. 78(b).

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must grant a party's motion for summary judgment if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). A genuine issue of material fact exists where the issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Where there is a genuine dispute of facts, those "facts must be viewed in the light most favorable to the nonmoving party." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

To defeat a motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original) (quoting a prior version of Fed. R. Civ. P. 56(e)). In analyzing whether a party is entitled to summary judgment, a court "may consider only the portion of the submitted materials that is admissible or useable at trial." *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008) (quoting *Walker v. Wayne Cty.*, 850 F.2d 433, 434 (8th Cir. 1988)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and the moving

party is entitled to judgment as a matter of law. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (quoting *Ricci*, 557 U.S. at 586).

## IV.   DISCUSSION

The Court first addresses Defendants' arguments related to scope of liability. The Court holds Kerr is individually liable for his actions because he acted outside the scope of his employment at all relevant times. The Court holds Defendants Kay-Decker and Mathis are not individually liable for their actions because they acted within the scope of their employment at all relevant times. The Court then turns to Defendants' merit-based arguments. The Court holds Defendants State of Iowa, Mathis, and Kay-Decker are entitled to judgment as a matter of law on Plaintiffs' claims for intentional infliction of emotional distress and invasion of privacy. Defendants are not entitled to judgment as a matter of law on Plaintiffs' claim for negligent infliction of emotional distress.   Finally, Defendants Mathis and Kay-Decker are entitled to judgment as a matter of law on Plaintiffs' § 1983 claim.

### A.   Scope of Liability

Defendants make two arguments related to the scope of their liability. First, they argue Kerr is individually liable on Counts I and III because he acted outside the scope of his employment at all relevant times. ECF No. 47-1 at 10–16. Second, Defendants argue Kay-Decker and Mathis are not individually liable on Counts I through V because they acted within the scope of their employment at all relevant times. *Id.* at 6–10.

Under Iowa law, the state is liable for the torts of its employees if they fall within the scope of employment. *Godfrey v. State*, 847 N.W.2d 578, 586 (Iowa 2014). Whether an action falls within the scope of employment is generally a question for the fact-finder. *Id.* But a court may grant summary judgment on the issue "if the record reveals a conflict concerning only the legal consequences of undisputed facts." *Id.* (quoting *Boelman v. Grinnell Mut. Reinsurance Co.*,

826 N.W.2d 494, 501 (Iowa 2013)). If a state employee's actions were within the scope of his or her employment, a court must substitute the state for the employee. *Id.*; *see also* Iowa Code § 669.5(2). If the employee's actions were outside the scope of his or her employment, the employer has no duty to indemnify the employee, nor can the employer be held vicariously liable for the employee's torts. *Godfrey*, 847 N.W.2d at 587; *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999).

An act falls within the scope of employment if it is of "the same general nature as that authorized or incidental to the conduct authorized." *Godar*, 588 N.W.2d at 705 (internal quotation marks omitted). In other words, an act is within the scope of employment if the act is "necessary to accomplish the purpose of the employment and is intended for such purpose." *Id.* (internal quotation marks omitted). An act falls outside the scope of employment only if it is "substantially different" than the authorized conduct. *Id.* at 706 (internal quotation marks omitted). Iowa courts look to the Restatement (Second) of Agency to help determine whether an employee action falls within the scope of employment. *See id.* (citing Restatement (Second) of Agency § 229(2) (Am. L. Inst. 1957)).

### 1.    Kerr acted outside the scope of his employment.

Defendants argue Kerr acted outside the scope of his employment because his conduct toward Plaintiffs—such as stalking them, secretly recording and filming them in the restroom and elsewhere, and extensively cataloguing his activities on his work computer—was "substantially different" from the duties he was authorized to perform as a Management Analyst 2. ECF No. 47-1 at 10 (quoting *Godar*, 588 N.W.2d at 706). Defendants point to Kerr's attempts to conceal his actions and his eventual guilty plea as evidence that he knew his actions were inappropriate, unauthorized, and illegal. *Id.* at 11–12. Defendants further emphasize that Kerr's motivation was purely personal—he engaged in these activities "to gratify his sexual urges." *Id.* at 12.

Plaintiffs disagree. They argue Kerr's behavior fell within the scope of his employment because the State of Iowa knew about it yet "tolerated and authorized" it for years. ECF No. 61 at 16–17. Plaintiffs concede Kerr's misconduct may originally have fallen outside the scope of his employment, but they argue it eventually became part of his job because he was spending hours of his day on these non-work-related activities, with no complaints from his supervisors. *Id.*

Under Iowa law, an employee's acts, including sexual misconduct, do not fall within the scope of employment merely because employment provides the setting or opportunity for the acts. In *Godar*, for example, the Iowa Supreme Court held a curriculum counselor was acting outside the scope of his employment when he sexually abused a special needs student, even though the counselor had access to the student through work and abused the student on school property. 588 N.W.2d at 706–07. The court reasoned that sexual abuse was not "of the same general nature" as the counselor's job duties, nor was it intended to further these duties or the objectives of any school programs. *Id.* Thus, although school provided the setting and opportunity for the abuse, the abuse was "so far removed from [the counselor's] authorized duties" that it fell outside the scope of his employment. *Id.* at 707; *see also Lindemulder v. Davis Cty. Cmty. Sch. Dist.*, No. 15-0067, 2016 WL 1679835, at *11 (Iowa Ct. App. April 27, 2016) ("The fact that some of the sexual activity occurred on school property and at school-sponsored events does not impose strict liability on the School District.").

On the other hand, an employee's acts—even if extreme—may be within the scope of employment if they were foreseeable to the employer. In *Godar*, for example, the Iowa Supreme Court was careful to note that "[t]here simply was no evidence to show that [the counselor's] alleged conduct was expected, foreseeable, or sanctioned by the school district." 588 N.W.2d at 707. This distinction is further illustrated by *Weems v. Federated Mutual Insurance*

*Company*, where the United States District Court for the Northern District of Iowa denied an employer's motion for summary judgment on the issue of whether one of its supervisors was acting within the scope of his employment when he assaulted a marketing representative. 220 F. Supp. 2d 979, 992–94 (N.D. Iowa 2002). The court reasoned the supervisor "worked frequently and intimately with those under his supervision" to motivate them to expand the business, so it was "at least reasonably foreseeable that the motivational methods . . . would encompass potentially heated interactions with marketing representatives felt to be underperforming." *Id.* at 993. Thus, the Court was unwilling to hold as a matter of law that the supervisor's assault was a substantial deviation from his authorized duties. *Id.*

Finally, the Iowa Court of Appeals has suggested an employee's attempts to conceal his or her illicit acts tend to show the acts are not within the scope of employment. In *Giudicessi v. State*, the Iowa Court of Appeals held a doctor who had a sexual relationship with a former patient was acting outside the scope of his employment, in part because the doctor knew the relationship was inappropriate and took steps to conceal it. 868 N.W.2d 418, 423–24 (Iowa Ct. App. 2015). The court further emphasized the relationship was a substantial deviation from the doctor's normal job duties and began months after his treatment of the patient concluded. *Id.*

Here, Kerr's actions fell outside the scope of his employment. As Defendants concede, the facts of Kerr's misconduct are generally undisputed. ECF No. 47-1 at 15. Looking to these undisputed facts, it is evident that Kerr's misconduct was "substantially different" from the duties he was officially authorized to perform. *Godar*, 588 N.W.2d at 706. As a Management Analyst 2, Kerr reimbursed tax monies to local governments. ECF No. 58-5 ¶¶ 20–21. His core job functions included administering tax laws and collecting and distributing revenue according to Iowa's tax laws. *Id.* ¶ 21. Kerr's sexually motivated misconduct toward Plaintiffs and other male employees bore no conceivable relation to these official duties. *See Godar*, 588 N.W.2d at 706–07.

His attempts to conceal his misbehavior support this conclusion, although the evidence shows he was less secretive in the latter part of his employment. *See Giudicessi*, 868 N.W.2d at 423–24; ECF No. 58-5 ¶¶ 23, 25; ECF No. 64 ¶ 105. And under *Godar*, it is not dispositive that much of Kerr's misconduct took place at work during work hours, or that the victims were his co-workers. *See* 588 N.W.2d at 707.

Perhaps most importantly, Kerr's motivation was purely personal. The Restatement (Second) of Agency § 229—which Iowa follows—makes clear that an employee's actions are within the scope of employment only if the employee intended them, at least in part, to serve the employer. Restatement (Second) of Agency § 229 cmt. c ("Although the servant is authorized to act, the master is not liable for his conduct unless the servant is in fact acting in the employment and for his master's purposes."); *id.* cmt. e ("The fact that the act . . . is actuated by a purpose not to serve the master indicates that the act is not within the scope of the employment."). Here, it is undisputed that Kerr's sexual urges were the driving force behind his misconduct. ECF No. 58-5 ¶ 42. Plaintiffs have not argued that Kerr's conduct was motivated even in part to serve the IDR. As such, it falls outside the scope of his employment.

Plaintiffs argue Kerr's misconduct became part of his authorized job duties because his supervisors knew about it but did nothing to prevent it. ECF No. 61 at 16–17. As noted above, foreseeability is relevant to the scope of employment inquiry. *See Godar*, 588 N.W.2d at 707; *Weems*, 220 F. Supp. 2d at 992–94; *see also* Restatement (Second) of Agency § 229(2)(f) (listing as a factor "whether or not the master has reason to expect that such an act will be done"). But Plaintiffs have cited no Iowa cases holding that foreseeable actions fall within the scope of employment when they bear no relation to the employee's job duties and are done for purely personal reasons. In *Weems*, for example, the court held a supervisor's assault on a marketing representative was foreseeable because the supervisor's job involved "motivational methods"

that could foreseeably "encompass potentially heated interactions with marketing representatives felt to be underperforming." 220 F. Supp. 2d at 993.

Case law from other jurisdictions confirms that even foreseeable misconduct must be partially driven by an intent to serve the employer. An illustrative case applying the factors of Restatement (Second) of Agency § 229(2) is *State v. Schallock*, 941 P.2d 1275 (Ariz. 1997). There, an employer failed to prevent a supervisor from harassing and assaulting subordinate female employees, despite knowing "for close to a decade" of the supervisor's "egregious improprieties." *Id.* at 1282. The court found a jury question existed as to whether the supervisor had acted within the scope of his employment, in part because the evidence supported a finding that the supervisor's actions were partially motivated by an intent to serve his employer. *Id.* at 1282–84. As the court put it: "In fondling the file clerks and offering advancement for sex, [the supervisor] was both serving the master by running the office—a task he was explicitly authorized to do—and serving his personal desires." *Id.* at 1283.

The same logic does not apply here. Plaintiffs have pointed to no evidence that would support a finding that Kerr intended to serve the IDR through his sexually motivated misconduct. Unlike the employee in *Schallock*, Kerr did not hold a supervisory role, nor is there any evidence indicating his job required him to interact regularly with Plaintiffs. Instead, the evidence demonstrates his conduct toward Plaintiffs was a clear deviation from his official duties, motivated by purely personal desires. Even assuming the evidence supports a finding that IDR supervisors knew about Kerr's misconduct and chose to allow it, this evidence does not generate a genuine dispute of fact as to scope of employment absent some additional evidence supporting the conclusion that Kerr intended to serve the IDR.

As a matter of law, Kerr acted outside the scope of his employment at all relevant times. Accordingly, the State of Iowa is not statutorily required to indemnify him. *See Godfrey*,

847 N.W.2d at 586; Iowa Code § 669.5(2). For the same reason, the State of Iowa is not vicariously liable for his actions. *See Godar*, 588 N.W.2d at 705.

## 2. Kay-Decker and Mathis acted within the scope of their employment.

Relying on the same legal principles, Defendants argue Kay-Decker and Mathis are not personally liable for their actions because they acted within the scope of their employment at all relevant times. ECF No. 47-1 at 6–10. Plaintiffs respond a genuine issue of fact exists as to whether Mathis acted outside the scope of her employment when she "repeatedly refused to take action and report Ken's actions to HR." ECF No. 61 at 15. As for Kay-Decker, Plaintiffs argue the minimal evidence Defendants have submitted as to her knowledge about Kerr's actions does not warrant summary judgment. *Id.* at 13–14; Notice Re: Pls.' Resist. Defs.' Mot. Summ. J. ¶ 4, ECF No. 81.[4]

Plaintiffs have not demonstrated a genuine issue of fact as to whether Mathis acted outside the scope of her employment. Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that Mathis repeatedly failed to report inappropriate and illegal behavior, some of which she witnessed and some of which Wagner reported to her; that Mathis should have reported this information years before August 2015; and that by reporting it earlier Mathis could have prevented Kerr's continued harassment of Wagner and could have prevented Kerr from harassing Bates and Lofton. *See* ECF No. 64 ¶¶ 163–174. In short, the evidence supports a conclusion that Mathis continuously failed to perform her supervisory duties over an extended period, causing harm to Plaintiffs.

---

[4] Plaintiffs initially asked the Court to reserve ruling on whether Kay-Decker acted within the scope of her employment, pending the State of Iowa's responses to Plaintiffs' requests for production of documents relating to Kay-Decker. ECF No. 61 at 13–14. Plaintiffs now concede they have received those outstanding responses and do not have additional evidence to add in support of their Resistance. ECF No. 81 ¶ 3.

But a supervisor's failure to act falls within the scope of his or her employment so long as the supervisor is on-duty and has a duty to act. The Restatement (Second) of Agency provides an employee's failure to act falls within the scope of his or her employment if the employee has "duties to perform at the time and the master . . . owe[s] to the person injured a duty that the servant should act." Restatement (Second) of Agency § 232 cmt. a. This rule covers even extreme failures to act. *See id.* cmt. a, illus. 1 (instructing that a night watchman who discovers a house fire while on duty but negligently fails to put it out or report it acts within the scope of employment). Iowa courts have not expressly adopted § 232, but the Iowa Supreme Court has looked to other sections of the same Restatement for guidance on scope of employment. *See Godar*, 588 N.W.2d at 706 (following Restatement (Second) of Agency § 229(2)). Moreover, Iowa courts have relied on the principles embodied in § 232 to hold that employers are not liable for the off-duty negligence of their employees. *Darling v. Remington*, No. 04-0994, 2005 WL 600252, at *3 (Iowa Ct. App. Mar. 16, 2005) (holding farm employee was not liable for death of guest that occurred while he was off-duty); *see also Freeman v. Busch*, 150 F. Supp. 2d 995, 1004 (S.D. Iowa 2001) (citing the Restatement (Second) of Agency and holding college was not liable for student security guards' failure to act because guards were off-duty and thus not under a duty to act).

Applying these principles here, Mathis acted within the scope of her employment at all relevant times. Plaintiffs' claims against Mathis are predicated on her failure to act—and her duty to act—as an on-duty IDR supervisor. *See* ECF No. 61 at 14–15. Plaintiffs have not alleged—and the evidence does not suggest—that Mathis was off duty when she failed to act, so there is no basis to conclude her failure to act fell outside the scope of her employment. Plaintiffs also have not shown that Mathis stepped outside of her supervisory role in other ways, for example by engaging in intentional acts to facilitate Kerr's misconduct. Plaintiffs speculate from Mathis's failure to act that she bore "ill intent" toward them, but they point to no evidence supporting this conclusion

beyond Mathis's "refusal to act." ECF No. 61 at 15. So long as Mathis was acting as an on-duty IDR supervisor, her failure to act fell within the scope of her employment.

Plaintiffs have also failed to demonstrate a genuine issue of fact as to whether Kay-Decker acted outside the scope of her employment. As Plaintiffs acknowledge, the only facts about Kay-Decker supported by the evidence are that she was the IDR director from 2011 until 2019 and that she had no independent knowledge of Kerr or his misconduct prior to the IDR's internal investigation, which she was not directly involved with. ECF No. 61 at 13; ECF No. 81 ¶ 4; *see also* ECF No. 58-5 ¶¶ 2, 71. These facts do not support a finding that Kay-Decker acted outside the scope of her employment because they provide no basis from which a jury could conclude Kay-Decker's actions were substantially different from her job duties. *See Godar*, 588 N.W.2d at 706. To defeat a motion for summary judgment, Plaintiffs "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original) (quoting a prior version of Fed. R. Civ. P. 56(e)). Plaintiffs have not made this showing.

As a matter of law, Mathis and Kay-Decker acted within the scope of their employment at all relevant times. Accordingly, the Court will substitute the State of Iowa as a defendant for Mathis and Kay-Decker on Counts I through IV. *See* Iowa Code § 669.5(2). The Court will also substitute the State of Iowa as a defendant for Kay-Decker on Count V. *See id.*

## B.     Intentional Infliction of Emotional Distress

Defendants also move for summary judgment on Plaintiffs' claim for intentional infliction of emotional distress. ECF No. 47-1 at 16–18. Defendants argue Plaintiffs cannot demonstrate sufficiently outrageous conduct on the part of any IDR supervisor or employee other than Kerr. *Id.* Plaintiffs respond that a jury issue exists as to whether IDR supervisors engaged in outrageous conduct by tolerating Kerr's extreme behavior and even joking about it and mocking Plaintiffs for being victims of it. ECF No. 61 at 19. Plaintiffs also discuss Kerr's conduct at length, but as

explained above, the State of Iowa is not vicariously liable for Kerr's conduct and Kerr has not moved for summary judgment on Plaintiffs' intentional infliction of emotional distress claim. *See id.* at 17–18.

A claim of intentional infliction of emotional distress has four required elements: "(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123–24 (Iowa 2004)). Plaintiffs must establish a prima facie case of outrageous conduct, and "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Id.* (quoting *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991)). If reasonable people could differ about whether conduct is sufficiently outrageous, the matter should be left to the jury. *Id.*

Outrageous conduct is a high standard which "is not easily met, especially in employment cases." *Smith*, 851 N.W.2d at 26 (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996), *abrogated on other grounds by Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Van Baale*, 550 N.W.2d at 156).

Here, the evidence would allow a jury to conclude that several IDR supervisors knew about Kerr's extreme conduct but failed to prevent it; that supervisor Benson regularly referred to Kerr as Wagner's stalker; that Benson smiled or chuckled when Kerr's behavior toward Wagner came up; and that Lofton's supervisor Lockwood laughed when Lofton reported that he had caught Kerr

26

filming him in the restroom. ECF No. 64 ¶¶ 137, 138, 161; *see also id.* ¶¶ 104–83. The evidence also permits a finding that other IDR employees joked about Kerr's conduct and mocked Plaintiffs for being victims of it. ECF No. 58-5 ¶¶ 62, 64. Lofton admits he was friends with some of the employees who joked about Kerr's behavior or mocked him. *Id.* ¶ 65.

These facts do not create a genuine dispute as to whether IDR supervisors or employees other than Kerr engaged in outrageous conduct. First, only intentional or reckless conduct can give rise to a claim for intentional infliction of emotional distress, so mere knowledge and failure to act does not qualify. *See Smith*, 851 N.W.2d at 26. Second, even assuming all the jokes and mockery Plaintiffs endured are attributable to the State of Iowa, this behavior does not rise to the level of outrageous conduct. Kerr's conduct may have been outrageous, but Kerr has not moved for summary judgment. As to the other Defendants, the evidence indicates that IDR supervisors and employees made light of Kerr's egregious conduct and its effect on Plaintiffs. These actions may have been insensitive, but they were not "atrocious." *Smith*, 851 N.W.2d at 26 (quoting *Van Baale*, 550 N.W.2d at 156). The fact that some of the IDR employees engaging in this conduct were friends with Lofton reinforces this conclusion. *See Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (noting "the relationship between the parties" is relevant to whether conduct was outrageous).

The Iowa Supreme Court has rejected claims of intentional infliction of emotional distress on more extreme facts than those alleged here. In *Vinson*, for example, the Iowa Supreme Court held the evidence did not support a finding of outrageous conduct where supervisors engaged in a "deliberate campaign to badger and harass" the plaintiff because she questioned the employer's seniority policy and expressed concern over pay issues. *Id.* at 119–20. Although it acknowledged the "defendants' actions were petty and wrong, even malicious," the Iowa Supreme Court held a trier of fact could not conclude they "went beyond all possible bounds of decency and must be

regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 119. Here, IDR supervisors and co-workers did not initiate a campaign to harass Plaintiffs. Rather, the evidence shows they made light of Kerr's serious misconduct through tasteless jokes and comments. There is no evidence to suggest this behavior was "atrocious, and utterly intolerable in a civilized community." *Smith*, 851 N.W.2d at 26 (quoting *Van Baale*, 550 N.W.2d at 156).

For these reasons, Plaintiffs' claim for intentional infliction of emotional distress against the State of Iowa fails as a matter of law. The Court dismisses the State of Iowa as a defendant to Count I.

### C.    Negligent Infliction of Emotional Distress

Next, Defendants argue Plaintiffs' claim for negligent infliction of emotional distress fails on the merits. ECF No. 47-1 at 18–20. Specifically, they contend the State of Iowa did not owe Plaintiffs a duty to prevent them from suffering emotional distress. *Id.* Plaintiffs disagree, arguing the nature of the relationship between the parties makes the State of Iowa liable for Plaintiffs' emotional distress. ECF No. 61 at 19–20.

Generally, emotional distress damages are not recoverable in tort actions "absent intentional conduct by a defendant or some physical injury to the plaintiff." *Miranda v. Said*, 836 N.W.2d 8, 14 (Iowa 2013) (quoting *Clark v. Estate of Rice ex rel. Rice*, 653 N.W.2d 166, 169 (Iowa 2002)). "This rule recognizes that there is generally no duty in tort law to avoid causing emotional harm." *Id.*

But this rule has exceptions. In particular, the Iowa Supreme Court has recognized "'a duty to exercise ordinary care to avoid causing emotional harm' when supported by the nature of the relationship between the parties and the nature of the acts engaged in by the defendant within the

context of the relationship." *Id.* (quoting *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990)).[5]

This exception applies when an obligation is

> so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the [obligation] that such suffering will result from its breach.

*Id.* at 19–20 (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 921 (Iowa 1976)).

Whether a given relationship creates a duty to prevent emotional distress is a question of law. *See id.* at 28. This legal determination requires "an examination of whether an actor's conduct occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." *Id.* (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 47 (Am. Law Inst. 2012)). The focus is on the unique facts of the relationship between the parties. *See id.* at 28–30, 32–33. A negligent actor is liable for emotional distress damages only when the defendant's negligence "is very likely to cause severe emotional distress." *Id.* at 29–30.

The Iowa Supreme Court has applied this exception in only a few discrete contexts, though it has suggested that new applications may arise. *See id.* at 28–29. In *Mentzer v. Western Union Telegraph Co.*, the court held emotional distress damages were available in an action for the negligent delivery of a telegram announcing the death of loved one. 62 N.W. 1, 6 (1895). In *Oswald v. LeGrand*, the court held emotional distress damages were available in an action for medical malpractice resulting from the negligent examination and treatment of a pregnant woman associated with the death of her premature child. 453 N.W.2d 634, 639 (Iowa 1990). And in *Meyer*,

---

[5] A separate exception allows plaintiffs who witness the negligent infliction of a serious injury on a close relative to sue for emotional distress damages. *Miranda*, 836 N.W.2d at 14 n.4. That exception is not at issue here.

the court held emotional distress damages were available in an action for breach of a contract to perform funeral services. 241 N.W.2d at 920.

Most recently, in *Miranda*, the Iowa Supreme Court held emotional distress damages were available in a legal malpractice action against an immigration attorney whose negligent advice led to the separation of family members for a decade. 836 N.W.2d 8, 33 (Iowa 2013). The court acknowledged the attorney-client relationship does not automatically give rise to a duty to prevent emotional distress. *See id.* at 24. But it held the specific circumstances of the relationship in that case created a duty: The attorney had authored a memorandum for his clients' citizenship applications explaining the "extreme hardship" that would accompany family separation, demonstrating his specific awareness of the emotional stakes for his clients. *Id.* at 11–12, 32–33. Despite this knowledge, the attorney advised his clients to pursue what he knew was a legally unauthorized application process and even told them it had a 99% chance of succeeding. *Id.* at 33. In these circumstances, the court concluded the attorney and clients' relationship "was the type of relationship in which negligent conduct was especially likely to cause severe emotional distress, supporting a duty of care to protect against such harm." *Id.*

The Iowa Supreme Court has not resolved when a duty to prevent emotional distress arises in the employment context. It has noted in the context of intentional infliction of emotional distress that a "plaintiff's status as an employee entitle[s] him to more protection from insultive or abusive treatment than would be expected in interactions between two strangers." *Smith*, 851 N.W.2d at 29 (internal quotation marks omitted). But it has never held the employer-employee relationship automatically creates a duty to prevent emotional distress. Instead, the existence of a duty in this context likely depends on the specific facts of the relationship. *See Miranda*, 836 N.W.2d at 32–33. Under certain circumstances, an employer–employee relationship—like an attorney–client relationship—may give rise to a duty to prevent emotional distress. *Cf. Smith*,

851 N.W.2d at 28–29 (noting the Iowa Supreme Court had never found an employee's claim for intentional infliction of emotional distress raised a jury question but holding a jury question existed where a supervisor engaged in "unremitting psychological warfare" against an employee).

Viewing the evidence in the light most favorable to Plaintiffs, the Court cannot say as a matter of law that the State of Iowa did not have a duty to prevent Plaintiffs from suffering emotional distress. First, a jury could find that IDR supervisors knew the severity of Kerr's conduct. For example, a jury could find that supervisor Mathis knew long before the IDR's investigation that Kerr was routinely following Wagner, including into the IDR restroom where he attempted to view Wagner's genitals, and that he was secretly photographing or filming Wagner's crotch area at work events. ECF No. 64 ¶¶ 163–70. A jury could reach similar conclusions about the knowledge of other IDR supervisors. *See id.* ¶¶ 104–83. A jury could also find that IDR supervisors knew before the IDR's investigation that Kerr was photographing or filming male employees using the IDR restroom. For example, Lofton testified that when he told his supervisor Lockwood that he had caught Kerr filming him from an adjacent stall in the restroom, Lockwood laughed and said, "it was bound to happen to somebody." *Id.* ¶ 137. A jury could find from this testimony that Lockwood had actual knowledge that Kerr was filming, or was going to film, employees using the restroom.

Second, a jury could find that IDR supervisors knew the emotional impact Kerr's conduct would have on Plaintiffs. Wagner repeatedly reported Kerr's behavior to his supervisors, discussed it with them at length, and informed them of his own attempts to make it stop. *See id.* ¶¶ 113–16, 119–21, 123–31, 141–48, 150, 162, 166–70. He informed one supervisor that Kerr's behavior was preventing him from getting his work done. *Id.* ¶ 116. Lofton also reported Kerr's behavior, and told supervisor Peterson that Kerr made him uncomfortable. *Id.* ¶¶ 122, 179. A jury could infer from these facts that IDR supervisors knew or should have known Wagner and Lofton were very

distressed by Kerr's behavior. And if a jury were to find—as it could—that IDR supervisors also knew that Kerr was secretly engaging in more extreme misconduct, such as restroom filming, the jury could infer that these supervisors knew or should have known that Kerr's misconduct would cause significantly more distress in the future when Plaintiffs discovered the full extent of it.

Beyond IDR supervisors' specific knowledge of the emotional impact of Kerr's conduct, a jury could find that supervisors were on notice from the nature of Kerr's misconduct that it would cause severe emotional distress. Kerr was intruding into extremely private and sensitive areas by secretly filming Plaintiffs' naked bodies while they used the restroom. *See York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body."). The Iowa Supreme Court has commented in a related context on the emotional impact of secretly filming employees in the restroom. *See Koeppel v. Speirs*, 808 N.W.2d 177, 184 (Iowa 2011) (noting the invasion of privacy tort "protects against acts that interfere with a person's mental well-being" and describing the secret use of a recording device in restroom as "abhorrent" to those interests). Importantly, the *Koeppel* court noted that secret restroom filming "could give rise to the tort of intentional infliction of emotional distress," implying that severe emotional distress is a likely consequence of such filming. *Id.* at 185 n.2; *see also Smith*, 851 N.W.2d at 26 (listing severe or extreme emotional distress as an element of intentional infliction of emotional distress). Coupled with supervisors' specific knowledge about how Kerr's conduct was affecting and would likely affect Plaintiffs, the extremely private and personal nature of Kerr's invasions would allow a jury to conclude that IDR supervisors' continuous failure to prevent Kerr's conduct "was very likely to cause severe emotional distress." *Miranda*, 836 N.W.2d at 29–30.

Under these specific factual circumstances, a genuine issue of material fact precludes judgment as a matter of law as to whether the State of Iowa was under a duty to prevent Plaintiffs

from suffering emotional distress. Viewing the evidence in the light most favorable to Plaintiffs, IDR supervisors knew Kerr's conduct was severe. IDR supervisors knew Kerr's conduct was unwelcome and was causing distress. IDR supervisors knew Kerr's conduct intruded into the most private and sensitive areas of human life, which put them on notice that Kerr's conduct—if permitted to continue—was very likely to cause extreme emotional distress. The State of Iowa is not entitled to summary judgment on Plaintiffs' claim for negligent infliction of emotional distress.

### D.     Invasion of Privacy

Defendants also move for summary judgment on Plaintiffs' invasion of privacy claim. ECF No. 47-1 at 20–24. The parties agree that two forms of invasion of privacy are relevant here: 1) unreasonable intrusion upon seclusion, and 2) unreasonable publicity given to another's private life. *See id.*; ECF No. 61 at 20. The Iowa Supreme Court follows the principles of the Restatement (Second) of Torts for both torts. *Howard v. Des Moines Register & Tribune Co.*, 283 N.W.2d 289, 301 (Iowa 1979) ("Because we have adopted the Restatement definition of the invasion of privacy tort, it is reasonable to refer to the Restatement explanation of its elements.").

#### 1.     Unreasonable intrusion upon seclusion

The tort of unreasonable intrusion upon seclusion has two elements: 1) an "intentional intrusion into a matter [in which] the plaintiff has a right to expect privacy"; and 2) the intrusion must be "'highly offensive to a reasonable person.'" *Koeppel*, 808 N.W.2d at 181 (quoting *Stessman v. Am. Black Hawk Broad. Co.*, 416 N.W.2d 685, 687 (Iowa 1987)). Examples of such "intrusions" include a news reporter photographing a woman sick with a rare disease in a hospital room; a private detective taking intimate photos of activities in another's bedroom from an adjacent building; and a private detective tapping another person's phone line. *Id.* (citing Restatement (Second) of Torts § 652B illus. 1–3 (Am. Law Inst. 1977)).

Defendants argue Plaintiffs' claim for unreasonable intrusion upon seclusion fails against them because the facts reveal no intentional intrusions attributable to the State of Iowa. ECF No. 47-1 at 23–24. Plaintiffs disagree, pointing to Kerr's conduct toward them; IDR supervisors' failure to prevent Kerr's conduct; jokes and ridicule among IDR supervisors and employees; Richmond's disclosure of information from the investigation into Kerr; and the presence of dime-sized holes in IDR restrooms. ECF No. 61 at 20–23.

The evidence here, viewed in the light most favorable to Plaintiffs, does not give rise to a claim for unreasonable intrusion upon seclusion against Defendants. First, as explained above, Kerr's conduct is not attributable to the State of Iowa, so it alone does not create a genuine issue of material fact. Second, IDR supervisors' failure to prevent Kerr's harassment is not intentional conduct, so it also cannot serve as a basis for this tort, which requires an "intentional intrusion." *Koeppel*, 808 N.W.2d at 181. Third, IDR supervisors and employees did not "intrude" in any way upon Plaintiffs' "seclusion" by making jokes and ridiculing them for being victims of Kerr's conduct. The jokes and ridicule were after-the-fact reactions to Kerr's conduct. The examples from *Koeppel* make clear that unreasonable intrusion upon seclusion covers the direct act of snooping on another's private affairs—not discussing these private affairs after the fact, especially when the discussions are among third parties who did not participate in the intrusion. *See* 808 N.W.2d at 181. Fourth, Richmond's disclosure of confidential information that she had legitimate access to does not support a claim for intrusion upon seclusion. *See Hill v. MCI WorldCom Commc'ns, Inc.*, 141 F. Supp. 2d 1205, 1210 (S.D. Iowa 2001) (holding the unauthorized disclosure of properly obtained information does not state a claim under Iowa law for intrusion upon seclusion).

Finally, the existence of dime-sized holes in IDR restrooms does not give rise to an action for intrusion upon seclusion because there is no evidence to suggest these holes were maintained

intentionally, or that the State of Iowa created them to allow stall occupants to view others using the restroom. Indeed, the holes on Plaintiffs' floor were filled soon after Lofton complained about them. ECF No. 64 ¶ 210. Similarly, the mere presence of an unannounced female janitor in the men's restroom does not support a claim for unreasonable intrusion upon seclusion because there is no evidence to suggest the female janitor intentionally intruded on anyone's privacy. The IDR has public, multi-use restrooms where people are free to enter at will. That does not mean females may enter unannounced, but the mere fact that a female entered the restroom and attempted to clean it does not, without more, establish unreasonable intrusion upon seclusion. For example, Plaintiffs have not alleged, nor does the evidence show, that the female janitor ever positioned herself in such a way to watch Plaintiffs using the restroom. *Cf. Koeppel*, 808 N.W.2d at 178–79, 186 (holding evidence supported claim for unreasonable intrusion upon seclusion where secret camera was installed in small, unisex restroom and pointed towards toilet).

### 2. Unreasonable publicity given to another's private life.

"One who gives publicity to a matter concerning the private life of another" is liable for invasion of privacy "if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977) (quoting Restatement (Second) of Torts § 652D). "Publicity . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a.

The parties appear to agree the only conduct that potentially gives rise to this tort is Richmond's disclosure of information about the investigation into Kerr. *See* ECF No. 47-1 at 22–23; ECF No. 61 at 23–24. Defendants argue the State of Iowa is not liable for any unreasonable publicity because Richmond shared only limited information about the investigation

with a few people at the IDR. ECF No. 47-1 at 22–23. They further contend the information was already public and its disclosure would not be highly offensive to a reasonable person. *Id.* Plaintiffs respond Richmond disclosed private, confidential information regarding Plaintiffs and a jury could find this disclosure would be highly offensive to a reasonable person. ECF No. 61 at 23–24.

Plaintiffs have not demonstrated a genuine issue of material fact as to whether the State of Iowa is liable for unreasonable publicity of private facts. Viewing the evidence in the light most favorable to Plaintiffs, a jury could find Richmond shared the existence of Kerr's journal and rating spreadsheet, including certain details about these documents, with several other IDR employees during the IDR's investigation into Kerr. *See* ECF No. 64 ¶¶ 187–189. This evidence does not support a threshold finding of "publicity." In this context, "publicity" requires more than publication to a third party. Restatement (Second) of Torts § 652D cmt. a. The private information must be communicated to the public itself "or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* Sharing private information with "a small group of persons" is insufficient. *Id.*; *Hanson v. Hancock Cty. Mem'l Hosp.*, 938 F. Supp. 1419, 1437–38 (N.D. Iowa 1996) (granting employer's motion for summary judgment on employee's unreasonable publicity claim because employee alleged "only communication to a small group"). Examples of "publicity" are publication through print media or radio broadcasting. Restatement (Second) of Torts § 652D cmt. a. Richmond's alleged communication of private facts about the investigation to a small group of IDR employees does not qualify as "publicity."

Plaintiffs cite *Hill* in support their argument Richmond's actions constituted "publicity." In *Hill*, another judge in this District held "under Iowa law disclosure of private facts about a plaintiff to a third party may state a claim for invasion of privacy under the theory of public disclosure of embarrassing facts if there is a confidential relationship between the plaintiff and the

third party." 141 F. Supp. 2d at 1213. *Hill* based its holding on language from an Iowa Supreme Court case stating: "'[Publicity does not include communication] to the plaintiff's employer, or to any other individual, or even to a small group, *unless there is some breach of contract, trust or confidential relation which will afford an independent basis for relief.*'" *Id.* at 1211 (alteration in original) (emphasis in original) (quoting *Yoder v. Smith*, 112 N.W.2d 862, 864 (Iowa 1962)). The court in *Hill* acknowledged that Iowa courts had never applied the italicized language. *Id.* at 1211. Nevertheless, the *Hill* court relied on the italicized language to hold a telecommunications carrier could be liable for disclosing the plaintiff's unlisted number to one person—her ex-husband. *Id.* at 1211–13.

The Court declines to follow *Hill* on this point. The quoted language from *Yoder* does not indicate a confidential relationship eliminates the publicity requirement. Instead, it suggests that where such a relationship exists, there may be "an independent basis for relief"—meaning a different claim available to the plaintiff. *Yoder*, 112 N.W.2d at 864 (quoting William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 393–94 (1960)). The original source of the quoted language—a law review article by William L. Prosser—confirms this interpretation. Prosser cites two cases for the language that *Hill* relied upon. Prosser, *supra*, at 394 n.96 (citing *Berry v. Moench*, 331 P.2d 814 (Utah 1958); *Simonsen v. Swenson*, 177 N.W. 831 (Neb. 1920)). Neither case dealt with unreasonable publicity or invasion of privacy. *Berry* was an action for libel by a patient against his doctor. *See* 331 P.2d at 816–17. *Simonsen* was an action for breach of doctor–patient confidentiality. 177 N.W. at 831. These citations confirm that Prosser was acknowledging that another cause of action might apply when a non-public disclosure arises from a confidential relationship. Additionally, the Iowa Supreme Court adopted the Restatement (Second) of Torts after deciding *Yoder*. *See Howard*, 283 N.W.2d at 301. The Restatement "rejects the exception" that *Hill* reads into *Yoder*. 141 F. Supp. 2d at 1212.

For these reasons, the Court holds the State of Iowa is entitled to judgment as a matter of law on Plaintiffs' invasion of privacy claim. The Court dismisses the State of Iowa as a defendant on Count III.

### E.    Section 1983 Claim

Finally, Defendants move for summary judgment on Plaintiffs' claim against Mathis and Kay-Decker in their individual capacities for constitutional violations under 42 U.S.C. § 1983. ECF No. 47-1 at 24–28. They argue Plaintiffs' § 1983 claim is barred by qualified immunity. *Id.* at 24–27. They also argue the claim fails because the facts do not establish that Mathis or Kay-Decker caused the alleged constitutional violations. *Id.* at 27–28; *see also* Defs.' Reply Supp. Defs.' Mot. Partial Summ. J., ECF No. 63 at 3–6. Plaintiffs respond that Mathis and Kay-Decker are not entitled to qualified immunity because they violated Plaintiffs' clearly established right to privacy under the Fourteenth Amendment. ECF No. 61 at 24–25. Plaintiffs further argue the State of Iowa's "standard operating procedure" was to allow government employees like Kerr to harass other employees with impunity. *Id.* at 25–26.[6]

Plaintiffs' complaint alleges a violation of the constitutional "right to privacy." ECF No. 30 ¶ 89. Plaintiffs' summary judgment briefing clarifies their claim is rooted in "the individual's interest in avoiding disclosure of personal matters" protected by the Fourteenth Amendment. ECF No. 61 at 24 (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977)). This right protects against the "public dissemination" of "highly personal matters representing 'the most intimate aspects of human affairs.'" *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996) (quoting *Wade v. Goodwin*, 843 F.2d 1150, 1153 (8th Cir. 1988)).

---

[6] Plaintiffs initially asked the Court to reserve ruling on Defendants' motion for summary judgment as to this claim against Kay-Decker pending additional discovery. ECF No. 61 at 24 n.4. Plaintiffs now concede they have received the outstanding discovery and have no additional evidence to submit. ECF No. 81 ¶ 3.

Here, the evidence does not support a claim for constitutional violations under § 1983. Initially, Plaintiffs' policy and custom arguments are inapposite because only Mathis and Kay-Decker are defendants on this claim, both in their personal capacities. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (holding municipalities are liable under § 1983 only when an injury arises from a government policy or custom). On the merits, Plaintiffs' claim against Mathis and Kay-Decker fails because they do not argue—and the evidence does not suggest—that either Mathis or Kay-Decker disclosed personal information about Plaintiffs. Viewing the evidence in the light most favorable to Plaintiffs, the only identifiable IDR employee who disclosed information about Plaintiffs was Richmond. *See* ECF No. 64 ¶¶ 184–191. Mathis and Kay-Decker are not personally responsible for Richmond's actions, and they cannot be held liable under § 1983 unless they were personally involved in the disclosure. *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. . . . To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." (internal quotation marks and citation omitted)). The evidence here does not support a finding that either Mathis or Kay-Decker were personally involved in Richmond's disclosure.

For that reason, Plaintiffs' § 1983 claim fails on the merits. The Court need not reach Defendants' qualified immunity argument.

The Court notes that with the dismissal of Plaintiffs' § 1983 claim, the Court no longer has original jurisdiction over any of Plaintiffs' claims, the rest of which arise under state law and are not between diverse parties. *See* 28 U.S.C. §§ 1331, 1332. Thus, the Court has discretion to dismiss this lawsuit. 28 U.S.C. § 1367(c)(3) (providing "district courts may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over

which it has original jurisdiction"); *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) ("The district court is afforded broad discretion in determining whether to exercise supplemental jurisdiction."). The Court elects to retain jurisdiction. This case has been pending before the Court for over two years, during which time the Court has ruled on a motion to dismiss and now a motion for summary judgment. *See* ECF Nos. 1, 17. Trial is scheduled to begin on December 2, 2019. Text Order, ECF No. 38. In these circumstances, retaining jurisdiction better promotes judicial economy and fairness to the litigants. *See Waters v. Madson*, 921 F.3d 725, 735 n.6 (8th Cir. 2019) (noting a district court is not required to decline jurisdiction if doing so "would run contrary to judicial economy, convenience, fairness, and comity" (internal quotation marks omitted)).

## V.   CONCLUSION

Defendant Kenneth Kerr acted outside the scope of his employment at all relevant times; the State of Iowa is not bound to indemnify him, nor is it vicariously liable for his conduct. Defendants Courtney M. Kay-Decker and Betty Mathis acted within the scope of their employment at all relevant times; the State of Iowa must indemnify them. Defendant State of Iowa is entitled to judgment as a matter of law on Plaintiffs' claims for intentional infliction of emotional distress and invasion of privacy. A genuine issue of material fact precludes summary judgment for Defendant State of Iowa on Plaintiffs' negligent infliction of emotional distress claim. Defendants Kay-Decker and Mathis are entitled to judgment as a matter of law on Plaintiffs' claim for constitutional violations under 42 U.S.C. § 1983.

Thus, the Court dismisses Defendants State of Iowa, Courtney M. Kay-Decker, and Betty Mathis on Count I. Count I remains against Defendant Kenneth Kerr. The Court substitutes Defendant State of Iowa as a defendant for Defendants Courtney M. Kay-Decker and Betty Mathis on Count II. Count II remains against Defendant State of Iowa. The Court dismisses Defendants State of Iowa, Courtney M. Kay-Decker, and Betty Mathis on Count III. Count III remains against

Defendant Kenneth Kerr. The Court substitutes Defendant State of Iowa as a defendant for Defendants Courtney M. Kay-Decker and Betty Mathis on Count IV. Count IV remains against Defendant State of Iowa. The Court substitutes Defendant State of Iowa as a defendant for Defendant Courtney M. Kay-Decker on Count V. Count V remains against Defendant State of Iowa. The Court dismisses Count VI against Defendants Courtney M. Kay-Decker and Betty Mathis. Count VI remains against Defendant Kenneth Kerr. Count VII remains against Defendant Kenneth Kerr.

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment, ECF No. 47, is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

Dated this 6th day of November, 2019.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE